674 So.2d 1063 (1996)
Jeanette D. BAUGHMAN, et al., Plaintiff-Appellee,
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al., Defendant-Appellant.
No. 28369-CA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1996.
Rehearing Denied June 20, 1996.
*1065 Walker, Tooke, Lyons & McKeithen by Laurie Lyons, M. Christine Barbier, for Appellant.
Sam N. Gregorio, for Appellee.
Before BROWN, WILLIAMS and CARAWAY, JJ.
*1066 WILLIAMS, Judge.
The State of Louisiana, Department of Transportation and Development ("DOTD") appeals a judgment by the trial court finding it 90% at fault in causing the accidental highway death of James David Baughman and awarding the appellees, Jeanette and Kimberly Baughman, $1,106,411 in damages. For the reasons expressed, we affirm.

FACTS
James David Baughman was killed in an accident on the night of November 18, 1995 while traveling through a construction zone on Louisiana Highway 1 in Caddo Parish. The accident occurred when Baughman's vehicle left the southbound lane and collided with a pick-up truck driven by Allen Ferguson. It is uncontested that Ferguson was at all times in the northbound lane of travel, and that the accident occurred in the northbound lane.
The construction project was an asphalt overlay of Louisiana Highway 1. The southbound lane was being overlaid on the day of the accident and on that day, there was a drop-off, approximately three inches high, from the overlaid area that had been completed to the portion of highway which had not yet been overlaid. There was no edge striping between the edge of the southbound lane and its shoulder, and the overlay partially covered the highway's center stripes. Although there were construction signs at the beginning and end of the construction project, the testimony indicates that there was no "bump" warning sign where the overlay ended for the day, no warning signs of any other type, and no reduced speed signs. L.J. Earnest, Inc. was the general contractor for the job. However, DOTD was responsible for determining where warning signs were to be placed throughout the construction project, and for inspecting the construction and ensuring that it was being completed according to state specifications.
Baughman's widow, Jeanette Baughman, individually and on behalf of her minor daughter, Kimberly, filed suit against DOTD, L.J. Earnest, Inc., and Southern Gulf Transport, Baughman's employer. The plaintiff sought monetary damages for the wrongful death of James David Baughman from DOTD and L.J. Earnest, Inc., alleging that defects in the construction area and the lack of warning signs caused the accident; in the alternative, the plaintiff sought worker's compensation benefits from Southern Gulf Transport, alleging that Baughman was killed while in the course and scope of his employment with that company. All claims arising from Baughman's accident were settled or dismissed except the plaintiff's claim against DOTD.
After a bench trial, the trial court found DOTD 90% at fault for Baughman's death and L.J. Earnest, Inc. 10% at fault. The trial court awarded Kimberly Baughman $300,000 in general damages, and awarded Jeanette Baughman $300,000 in general damages and $500,000 in economic damages[1]. DOTD appeals.

DISCUSSION
Appellant advances the following contentions on appeal: (1) the trial court committed prejudicial error in failing to admit evidence of Baughman's blood alcohol content at the time of his death; (2) the trial court committed manifest error in failing to attribute a percentage of fault for the accident to Baughman; (3) the trial court abused its discretion by awarding Jeanette & Kimberly Baughman $300,000 each in general damages, and by awarding Jeanette Baughman $500,000 for loss of income and services. We find these contentions meritless.

Admissibility of Blood Alcohol Test Results:
Appellant contends that the trial court committed reversible, prejudicial error in refusing to allow the introduction of blood alcohol test results, taken from blood samples allegedly belonging to Baughman, into evidence.
The requirements for the introduction of an alcohol blood test analysis are *1067 "very stringent." Wells v. State Farm Mutual Automobile Insurance Company, 573 So.2d 223 (La.App. 1st Cir.1990); Allemand v. Zip's Trucking Company, 552 So.2d 1023 (La.App. 1st Cir.1989), writ denied, 558 So.2d 569 (La.1990). Before blood alcohol test results can be admitted in a civil or criminal proceeding, the party seeking to introduce the results must lay a proper foundation by "connecting the specimen with its source, showing that it was properly labeled and preserved, properly transported for analysis, properly taken by an authorized person, and properly tested." Bufkin v. Mid-American Indemnity Company, 528 So.2d 589, 593 (La. App.2d Cir.1988) quoting Swanson v. Estate of Augusta, 403 So.2d 118, 124 (La.App. 4th Cir.1981), writ denied, 407 So.2d 732 (La. 1981).
In the present case, the only witnesses to testify regarding the blood alcohol test results were Dr. Dawn Fain Young, laboratory director at Forensic Pathologists, Inc. where Baughman's autopsy was performed, and Patricia Norman, supervisor of the gas chromatography section at Puckett Laboratories ("Puckett") where the blood test was performed. Neither witness could recollect the events surrounding the drawing and testing of the specimen alleged to have been taken from Baughman. Each testified regarding the normal procedures followed in their respective facilities.
Dr. Young testified that according to her facility's log book, Baughman's body was delivered to Forensic Pathologists, Inc. on November 18, 1985 and assigned a unique autopsy number that would have been placed on all paperwork and specimens related to Baughman. Dr. Young also testified that she assisted the coroner with all his autopsies, and that she was the only person drawing specimens at the time of Baughman's autopsy. However, she did not remember drawing a blood specimen from Baughman's body, nor was there any documentation showing that she or anyone else actually drew blood from Baughman. Dr. Young could only testify that Baughman's blood must have been drawn since a blood analysis for a specimen bearing Baughman's autopsy number was done. Dr. Young further testified that according to standard operating procedure, she would have drawn two samples of blood, placed them in appropriate tubes for preserving blood samples, labeled the specimens with Baughman's autopsy number and placed them in the cooler unit until they were transported to the testing facility.
As to the question of when the blood was shipped, Dr. Young testified that she probably drew the blood sample on November 19, 1985 and the final report from Puckett indicates that the blood specimen remained in her company's cooler for approximately sixteen or seventeen days before it was shipped to Puckett.[2] Dr. Young testified that their standard procedure was to ship specimens by courier to Puckett, most likely by "Airborne." However, we note that there is no evidence of a receipt to Forensic Pathologist's, Inc. showing the shipment of the specimen, or any records other than the final laboratory report showing that a specimen bearing Baughman's autopsy number was received by Puckett's accessioning department. Dr. Young testified that she was the only person in the laboratory authorized to request toxicology tests. Additionally, she identified the blood test request form that should have accompanied the specimen to Puckett Laboratories. However, she acknowledged that only the word "blood" was written in her handwriting. Dr. Young explained that the request would have been made at her direction and merely filled out by an employee.
Although Patricia Norman had never worked in Puckett's accessioning department, she was called to testify concerning the standard procedures of that department at the time Baughman's blood sample was tested. She testified that when specimens were received, the accessioner matched the requests in the shipment to the tubes containing the specimens, assigned a unique Puckett number to each specimen, and checked to see that the specimens had been preserved in the proper container; then, someone in accessioning *1068 transported the specimen to the appropriate section for testing. Although there was no paperwork showing that the specimen was received intact in the accessioning department, Norman testified that had there been any abnormalities related to the specimen, such abnormalities would have been noted on the final report from which she was testifying. There were no such notations on the report.
Additionally, Norman testified regarding the standard procedures followed by Puckett for blood alcohol testing. Although she had no personal recollection of performing the test, Norman testified that since her initials appeared on the final report indicating that since she telephoned the results to Forensic Pathologists, Inc., then she must have performed the test. However, Norman also admitted that at times, the person calling in the test results was not the same person who performed the test. There was no additional evidence offered to identify the person who actually performed the test. Norman further testified that before doing any blood alcohol testing, she runs several "controls" to ensure that the machine is properly calibrated. However, there was no paperwork available to show that the machine was properly calibrated on the day Baughman's blood alcohol test was allegedly performed. Norman stated that the paperwork showing the calibration procedures had been destroyed because under the rules of the laboratory's accreditation, the laboratory was only required to keep the paperwork for a specified time period. Norman stated that had there been any malfunctioning of the gas chromatograph, it would have been noted on the final report.
Appellant relies on several cases in which blood alcohol test results were deemed admissible to support its contention that the trial court erred in the present case.[3] However, in all of the cases cited, there was either documentation or independent recollection to show that a specimen was actually taken from the appropriate body. After a thorough review of the record, we agree with the trial court's finding that the appellant failed to lay the proper foundation for the admissibility of the blood test results into evidence. Because of the inadequacies in the chain of custody in the present case, namely no documentation or independent recollection to show that a blood sample was actually taken from Baughman; an excessive amount of time between the time the sample was allegedly drawn and the time it was delivered for testing; no documentation or independent recollection to show that the sample was properly shipped and received intact; no documentation or independent recollection to show that the chromatograph was working properly at the time the blood sample was tested; and no evidence establishing that the testing was actually performed by an authorized person, the trial court did not err in refusing to admit the blood alcohol test results.

Apportionment of Fault:
Appellant also contends the trial court committed manifest error in failing to attribute any fault to Baughman. Appellant does not contest the trial court's adverse finding of liability, but merely asserts that the percentage of fault allocated to it should be reduced by Baughman's comparative fault. Appellant asserts that Baughman was presumptively negligent since he left his lane of traffic. Appellant further asserts that Baughman left his lane of traffic because he was driving while intoxicated and driving with a missing headlight.
Trial court findings regarding the apportionment of fault in negligence cases are factual matters and will not be disturbed by the reviewing court unless they are manifestly erroneous or clearly wrong. Stephens v. Town of Jonesboro, 25,715 (La.App.2d Cir. 8/19/94), 642 So.2d 274, 281; Keeth v. Department of Public Safety and Transportation, 618 So.2d 1154 (La.App. 2d Cir.1993). A motorist who leaves his lane of travel is presumed negligent, and must show that he *1069 was not guilty of any dereliction, however slight. Ferrell v. Fireman's Fund Insurance Company, 94,1252 (La. 2/20/95), 650 So.2d 742. In the present case, to rebut the presumption of Baughman's negligence, the appellees had to show that the deceased was not guilty of any slight dereliction in order for the trial court's assignment of fault to be correct. Ferrell v. Fireman's Fund Insurance Co., supra. Our review of the record reveals that there was ample evidence presented at trial to support both the trial court's finding that the presumption of Baughman's negligence had been rebutted and its assessment of fault. Therefore, we find that the trial court's assignment of fault is not manifestly erroneous.
Appellant asserts that Mr. Baughman was intoxicated and that his intoxication caused his inability to see and react to the bump in time to avoid the accident. Dr. Ned Walton, appellant's expert, testified that he understood the overlay to be 2 to 2.25 inches high and that a graduated incline[4] of 2 to 2.25 inches would not cause drivers to experience a jolt so hard that they would have difficulty controlling their cars. Walton also testified that a sober driver could negotiate an unmarked road safely, and that in his opinion, the accident was caused by Baughman's inability to see and react to the road conditions due to his intoxication.
Despite Dr. Walton's testimony, except for the inadmissible blood alcohol test results, there is little evidence to support appellant's contention that Baughman was intoxicated at the time of the accident. Only one witness, Michael Bunton, one of the first rescue workers at the scene of the accident, testified that he smelled alcohol at the scene. On the other hand, three other rescue workers, Wyatt Porterfield, Bruce Walker, Roy Tabor, and Dale Nix, a constable from Mooringsport, all testified that they smelled no alcohol at the scene of the accident. Porterfield, then a member of the Caddo Parish District 1 volunteer fire department, also stated that when he investigated accidents, he specifically looked for any indication that alcohol was a factor. DOTD points to the fact that an empty Budweiser beer can was found in Baughman's car. However, the presence of one beer can does not prove intoxication. Furthermore, Ferguson, the driver of the pick-up truck involved in the accident, testified that Baughman's car was driven in a normal manner and remained in its own lane of travel until immediately prior to the accident.
On the other hand, in its "Findings of Fact and Conclusions of Law," the trial court made the following factual findings:
iii. that there was no properly constructed paper joint[5] in place; instead, there was a discontinuity on the southbound lane which caused Mr. Baughmanlike Messrs. Creamer and Burtto experience a hard jolt;
iv. that the area was dark and weather conditions were cloudy;
v. that there were a maximum of two warning signs within a fifteen mile radiuseach sign 7.5 miles before the construction site at each end of the project;
vi. there were no cautionary signs warning of the multiple defects and dangerous conditions at the overlay site due to the failure of DOTD employees to erect them;
vii. that, in accordance with the testimony of Wyatt Porterfield, Dale Nix, and Jim McClure, all three of whom the *1070 Court deems credible, there was at least a three (3) inch drop-off between the southbound and northbound lanes at the site where Baughman left his lane;
xi. the cumulative effect of the multiple defects in the construction site and lack of warning [signs] caused Baughman's death.
The evidence presented at trial amply supports these findings.
Carol and Roy Posey, a husband and wife, traveled Highway 1 while the construction was in process. Carol Posey testified that she was frightened to travel along Highway 1 because it was difficult to see the overlay at night. She further testified that when she traveled over the area in question, she felt like she would lose control of her car. She stated that she felt the depth of the overlay drop-off was dangerous. Additionally, Mrs. Posey testified that during the times she traveled Highway 1 while the highway was under construction, there were no warning signs or reduced speed signs to warn drivers of the overlay drop-off. Roy Posey also testified that there were no warning signs or reduced speed signs near the area. He stated that the drop-off was not visible when traveling at night.
Mike Ragsdale also traveled Highway 1 during the time the road construction was in progress. He was the only witness to definitively testify that there were reduced speed signs and flashing construction lights at each end of the construction project. Ragsdale stated that there were several bad bumps in the construction area that caused his car to "bounce high." June Carr also testified as to the condition of the roadway in the area of the construction project. She stated that she saw one "under construction" sign at one end of the construction, but no warning signs or reduced speed signs. She also testified that it was very dark on the area of the highway near the accident scene unless there was a full moon.
Dale Kramer testified that he actually drove the construction area of Highway 1 on the night of Baughman's accident. He testified that there were no warning signs or reduced speed signs near the overlay drop-off area. He also testified that he did not know the bump was there before he hit it, and that at the time of the drop, he thought he was going to lose control of his car when he hit the bump. He estimated that the height of the overlay drop-off was approximately three to five inches high.
The group of individuals who were in the Ferguson pick-up truck also testified. Janie Fetzer, a passenger in the back seat of the pick-up, testified that she had been through the construction area prior to the night of the accident, and that she did not think anyone could see the bump when traveling at night. She also estimated the height of the bump to be four to six inches, and recalled seeing no warning signs. However, she testified that there may have been one 45 mile per hour speed limit sign. Bobbie Broom, the other backseat passenger, testified that she did not remember seeing any construction signs. Allen Ferguson, the driver of the pick-up truck, testified that he did not see any warning signs and that he did not know the bump was there before he hit it. He further testified that Baughman stayed in his lane of traffic and drove in a normal manner until immediately prior to the accident. Finally, Joan Ferguson, the front seat passenger in the pick-up also testified that there were no warning signs and that she did not see the bump before they hit it. She estimated the height of the drop-off to be two to three inches in depth.
Appellees' expert in traffic and safety engineering, Dr. John Glennon, testified that the lack of warning signs and the partially covered center stripe violated provisions of the Manual for Uniform Traffic Control and Safety Devices and certain standards adopted by the State of Louisiana. He also testified that gauge marks in the road indicating the point of impact, as well as the estimated speeds both drivers were traveling, were consistent with the theory that Baughman hit the bump, became disoriented, traveled into the other lane and collided with the Ferguson truck. Dr. Glennon described the area immediately preceding the bump as a "black hole." He opined that the lack of warning signs, the lack of reduced speed signs, the height of the drop-off and the partial covering of the center stripes *1071 gave rise to a lack of guidance for drivers, and these omissions caused the accident.
It is clear from the above summarized testimony that the trial court had ample evidence to conclude that it was the condition of the roadway and not any dereliction on Baughman's part due to intoxication that caused the accident. This testimony also indicates that it was reasonable for the trial judge to conclude that Baughman's missing headlight was not a legal cause or cause-in-fact of the accident. Driving with a missing headlight is a violation of LSA-R.S. 32:303. Violation of a statute constitutes negligence per se. However, the violation must also be a legal cause of the accident in order to be actionable. Poland v. Glenn, 623 So.2d 227 (La.App. 2d Cir.1993). Conduct is actionable where it is both a cause in fact of the injury and a legal cause of the harm incurred. The cause in fact test requires that "but for" the conduct of the person accused of negligence, the injuries would not have been sustained. The legal causation test requires that there be a "substantial relationship" between the conduct complained of and the harm incurred. Poland v. Glenn, supra.
Several witnesses testified that the construction area drop-off was not visible at night. There is no indication in the record that any of these witnesses had a defective headlight. Furthermore, Dr. Glennon described the area of the accident as a "black hole" because of the lack of warning signs and the covered roadway striping. The testimony presented at trial indicates that the accident would have occurred even if Baughman was operating his vehicle with two fully operational headlights. Therefore, the trial judge was not manifestly wrong in deciding that Baughman's missing headlight was not a cause in fact or the legal cause of the accident.
The appellant has failed to show that the trial court's factual findings relating to the assessment of fault are clearly wrong. Therefore, we decline to disturb the trial court's assessment of fault.

Quantum
Appellant contends the trial court's award of damages were an abuse of discretion. We disagree.
The trial court has much discretion in awarding general damages, and its determination of damages will not be disturbed on appeal absent abuse of that discretion. LSA-C.C. Art. 1999; Thomas v. State Farm Ins. Co., 499 So.2d 562 (La.App. 2d Cir.1986). Damages insusceptible to precise measurement, such as wrongful death, are wisely left to the great discretion of the trier of fact. Reid v. State Through Department of Transportation and Development, 25,778 (La.App. 2d Cir. 5/4/94) 637 So.2d 618.
Appellant relies primarily on this court's opinion in Thomas v. State Farm Insurance Co., 499 So.2d 562 (La.App. 2d Cir.1986) in support of its argument that the damages are excessive. Appellant asserts that the trial court failed to take into account the negative impact of Baughman's chronic drinking on his familial relationship.
There is little evidence in the record to support appellant's assertion that Baughman's drinking had a negative effect on his family. While plaintiff testified that her husband drank quite a bit, and that she had at one time asked him to seek professional help, there is no evidence that Baughman's drinking triggered a specific negative incident or an overall negative impact on the marital or parental relationship. In fact, the testimony is just the opposite. The plaintiff testified that Baughman had stopped drinking at her demand three weeks prior to his death. There was no testimony presented to indicate that the couple was having any marital problems prior to Baughman's death. Additionally, the record establishes that Baughman was in every sense of the word a "family" man. He was the main breadwinner and decision maker for the family. He took his wife and daughter on fishing trips, helped his daughter with her girl scout projects and cooked for her girl scout banquets. He helped his wife form a part-time career selling Tupperware and gardened with her. Baughman participated fully in family holidays, and he repaired all mechanical objects around the house. After his death, his wife *1072 lost weight and his daughter became afraid to answer the telephone for a period of time. His daughter additionally testified at trial that although ten years have passed since his death, she still cries for her father. The trial court concluded that Jeanette and Kimberly Baughman shared a close relationship with their husband and father.
In assessing its general damage award to Kimberly Baughman, the trial court considered the testimony elicited at trial and reviewed Aime v. Seaboard System Railroad, 94,0736 (La.App. 4th Cir. 12/15/94), 648 So.2d 20, which upheld an award of $700,000 to the minor child, Bozeman v. Reed, 92,0858 (La. App. 1st Cir. 3/11/94), 633 So.2d 944, writ denied, (La. 6/24/94); 640 So.2d 1345, which upheld an award of $275,000 to a minor child, Buckbee v. Aweco, Inc., 626 So.2d 1191 (La. App. 3d Cir.1993), which upheld an award of $300,000 to a minor child, Brown v. State, 572 So.2d 1058 (La.App. 5th Cir.1990), which upheld an award of $270,000 to a minor child. The testimony concerning Kimberly Baughman's relationship to her father is similar to the circumstances presented in some of the above cited cases. Because the record and jurisprudence reviewed by the trial court supports the trial court's award, we find no abuse of discretion in the trial court's award of $300,000 in general damages to Kimberly Baughman.
The trial court based its general damage award to Jeanette Baughman on Reid v. State Through Department of Transportation and Development, supra and the jurisprudence cited therein, in which awards in excess of $300,000 were given to spouses with close relationships with the decedent. Since the testimony shows that Jeanette and James David Baughman shared a close relationship, and that she depended on him for support in her part-time work as well as to make family decisions and take care of the house, we cannot say that the trial court abused its vast discretion in awarding $300,000 in general damages to Jeanette Baughman. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993).
Appellant conceded in the lower court that the special economic damages should be a total of $407,932.35[6]. Dr. Luvonia Casperson, appellees' economic expert, calculated that the lost income was $780,125.00. Appellant put on no evidence to contradict Dr. Casperson's findings. Nonetheless, appellant argues that the court failed to consider that Baughman had a sporadic employment history, debts from failed business ventures, the negative effects of chronic drinkers on long-haul truck drivers, and Baughman's actual income in 1984 and 1985. As stated above, the trial court concluded that the appropriate award for special economic damages was a lump sum of $500,000.
First, we note that the record does not indicate that Baughman had a sporadic employment history. His wife testified that at all times during their marriage, Baughman either worked for himself or for someone else. According to the record, Baughman was never unemployed. There was no evidence presented of debts from failed business ventures. Further, there was no evidence presented on the negative effects of chronic drinking on long-haul truck drivers. Additionally, the trial court is not bound to fix future income awards on the basis of past actual income. Hobgood v. Aucoin, 574 So.2d 344 (La.1990). Based on the evidence presented, we cannot say the trial court abused its discretion in its special economic damages award.
Based on our review of the record, we conclude the trial court did not abuse its vast discretion in either its award of general damages or special economic damages.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed in its entirety. All costs in this cause are assessed to the State of Louisiana, Department of Transportation and Development, to the extent allowed by law.
AFFIRMED.

*1073 APPLICATION FOR REHEARING
Before HIGHTOWER, BROWN, WILLIAMS, GASKINS and CARAWAY, JJ.
Rehearing denied.
NOTES
[1] $6,411 in funeral expenses were stipulated to by the parties and included in the trial court's total award.
[2] Puckett Laboratories' final report shows that Puckett received the blood specimen on December 6, 1985.
[3] Appellant cites the following cases in support of its argument: Ober v. CUNA Mutual Society, 26,208 (La.App. 2d Cir. 10/26/94), 645 So.2d 231; Hutson v. Madison Parish Police Jury, 496 So.2d 360 (La.App. 2d Cir.1986), writs denied, 498 So.2d 749 and 498 So.2d 758 (La.1986); McLaughlin v. Fireman's Fund Insurance Company, 582 So.2d 203 (La.App. 1st Cir.1991), writ denied, 586 So.2d 536 (La.1991); Gore v. City of Pineville, 598 So.2d 1122 (La.App. 3d Cir.1992).
[4] One point of contention in this case is whether or not the contractors laid a "paper joint" at the point where they stopped the overlay for the day. Truman Smith, DOTD's head asphalt inspector for the construction project, testified that a paper joint is constructed of brown paper and hot mix asphalt, and that it is tapered down from the overlay, and forms a ramp to facilitate cars moving off the new hot mix onto the existing hot mix to prevent a bump. The laying of the paper joint would cause the "graduated incline" that Dr. Walton referenced.
[5] Truman Smith also testified that the standard practice of the road crew was to lay a paper joint at the end of every day's construction. Smith testified that if a paper joint had not been laid at the end of the day on November 18, 1985, he would have complained about it and made a notation in the project diary. There was no such notation in the project diary.
[6] In its post-trial brief, the appellant itemized an economic loss award that amounted to $407,932.35.