ON REHEARING
LBROWN, J.,
On Rehearing.
Initially, the jury reached the factual question of causation and, finding none, needed to go no further. A reviewing court must accord great deference to the trier’s factual decision unless it is clearly wrong or, as in this case, untrustworthy because of the exclusion of material evidence. On rehearing, we reaffirm our original conclusions that the jury’s verdict is to be afforded no deference and, with the inclusion in the record of the previously sealed statement of Randy Rainwater, that causation can and should, in the interest of judicial economy, be decided de novo by this reviewing court. It is here, however, where we depart from our original opinion, find a causal connection and address its legal consequences.

CAUSATION

Less than five months after Cecil Masters purchased a new 1989 Ford F-250 pick-up truck, it was returned to the dealer because of problems. The truck had been driven 11,623 miles and was under warranty. Randy Rainwater, a mechanic for Courtesy Ford, examined the truck. Rainwater found an exhaust leak at the fitting for the Exhaust Gas Recirculator (“EGR”) tube and the EGR valve. He ordered a new EGR tube only after his attempt to tighten the connection between the tube and the valve failed to stop the leak. This occurred on November 21, 1989. On the morning of December 4, 1989, this fatal accident occurred. It was a cold morning, the truck’s windows were up and the heater was on. At times the truck was stopped and idling. Over a month after the accident, Courtesy Ford advised Cecil Masters’ widow by telephone that the EGR tube had arrived.
On May 3, 1990, Rainwater gave a recorded statement to an adjuster investigating the accident for U.S. Fidelity and Guaranty Insurance Company, the insurer of the dealer, Courtesy Ford. In answering discovery, Courtesy Ford responded that “statements were taken from Courtesy Ford employees which are [2privilege[d]” and included Rainwater’s name in a general list of employees. Only after trial started did plaintiffs discover the full extent of Rainwater’s involvement and that he had been interviewed by the adjuster. The trial court denied plaintiffs’ request for a copy of the transcript of Rainwater’s statement, finding that it was the work product of defense counsel. Even so, plaintiffs attempted to offer the statement, which they did not have, into evidence because Rainwater could not be found to testify. Plaintiffs’ offer was denied; however, a transcript of the statement was sealed and filed for the benefit of this reviewing court.
On appeal, this court found that the trial court abused its discretion in not allowing plaintiffs to have a copy of the transcript. Further,- this court found that Rainwater’s statement should have been admitted into evidence as a declaration against interest by a Courtesy Ford employee who was unavailable to testify. Both plaintiffs and defendants had tried unsuccessfully to locate Rainwater. With the inclusion of the statement, this court considered the record complete and in the interest of judicial economy, reviewed the facts de novo.
Defendants, Courtesy Ford and Ford Motor Company, claimed at trial that there was no leak but, even if there was, that no significant amount of exhaust gas spread into the cab of Masters’ truck. Rainwater’s statement, however, constituted direct evidence that there was an exhaust leak at the fitting between the tube and valve. In his statement, Rainwater emphasized that, because of the leak, the customer, Cecil Masters, should have been warned of the danger of carbon monoxide exposure. Specifically, he believed that Masters should have been told that “if you *190 keep your windows up and you get enough of that exhaust gas in there you know it could be dangerous ... you got to have some kind of ventilation to prevent you from getting that poisoning ... really you should park the truck until the part gets in and then put the part on ... that’s the way I feel about it.”
1,.¡Considering Rainwater’s statement, corroborated by the fact that Courtesy Ford ordered an EGR tube and that the experts found an overload fracture at the connection on the EGR valve, the evidence is compelling that there was an exhaust leak. Plaintiffs’ expert, Dr. Stafford, explained that carbon monoxide causes the body to work harder to get oxygen and that a person exposed to it may drift off to sleep. What part carbon monoxide played in causing the 15-year-old driver, Eric Masters, to fall asleep or lose consciousness is an essential hurdle that must be cleared. Because it was error for the trial court to have excluded Rainwater’s recorded interview, the jury’s answer to this question, which was decided without this critical evidence, was untrustworthy.
The circumstances of this accident strongly support the conclusion that carbon monoxide played a significant role in causing this incident. The state police investigator believed that the driver had fallen asleep. He was at the scene immediately following the accident and found no skid marks or other evidence of evasive action.
Lynn Kesee, a truck driver, followed the Masters vehicle for about eight miles and noted that after passing through Rocky Branch, the Masters truck did not resume speed, and, about a half a mile down the road, on an uphill stretch, in a no-passing zone and without any apparent reason, the Masters vehicle drifted across the yellow center line into the left lane, where it traveled between 50 and 60 yards before taking a shallow departure angle off of the highway, then traveled another 100 feet along the ditch before colliding with a tree. Kesee testified that at no time did the driver of the Masters vehicle attempt to stop or change its course. In fact, Kesee said the driver never moved in the cab of the vehicle.
Kesee’s observations were corroborated by Robert LaCage who was following Kes-ee and saw the Masters vehicle just after it left the road. Both Kesee and LaCage caught up and passed the Masters vehicle before it struck the tree.
|4The passenger, Cecil Masters, was slumped down out of Kesee’s sight the entire time that Kesee. was behind the truck. Eric Masters, who was upright while driving before the accident, was found slumped to the left, trapped against the driver’s side door. The steering wheel had been pushed into the driver’s seat. The obvious conclusion is that both passenger and driver were unconscious when the truck drifted across the road.
Terry Sue Anding, a registered nurse, was the first to render medical assistance at the accident site. She noticed that Cecil Masters’ blood was bright red, which is consistent with carbon monoxide asphyxia. Dr. Glennon, plaintiffs’ expert in accident reconstruction, opined that, based on the testimony, police report, and evidence of the driver’s failure to brake and the trajectory of the truck, the accident was caused by an unconscious driver. S.C. Walker, defendants’ accident expert, also stated that the path of the vehicle after it left the road was consistent with a driver who had gone to sleep.
Numerous witnesses gave testimony concerning the physical condition of Cecil Masters both before and at the time of the accident. Co-workers and his wife testified that a few weeks before the accident Masters had headaches and felt lethargic, which was unusual for him. One worker noticed that he was rubbing his temples and complaining of a headache on the morning of the accident. Both Roger Hearn and Jimmy Masters testified that several weeks preceding the accident, Cecil Masters was having headaches and tak *191 ing Tylenol. On one occasion, Masters complained to his uncle, Tom Masters, that it seemed that every time he rode in the truck he got a headache.
Approximately three years after the accident, plaintiffs had Cecil Masters’ body exhumed, and Dr. George McCormick, a forensic pathologist, performed an autopsy. Dr. McCormick believed that the traumatic injuries alone could not have caused Masters’ death. Specifically, he stated that the flail chest injury was not ¡.¡sufficient to have caused death. Dr. McCormick did not find a basilar skull fracture, which had been listed on the death certificate. Dr. McCormick believed that even if there had been such a fracture, without hemorrhaging (of which his-autopsy found no evidence), it would not have caused Masters’ death. Dr. McCormick concluded that the combined effect of carbon monoxide and the flail chest injury was the only reasonable explanation for Masters’ death.
Plaintiffs showed that passengers of an F-250 can be exposed to dangerous levels of carbon monoxide from a broken EGR valve when the engine is running rich. Defendants’ experts conceded that upon disconnecting the EGR tube, carbon monoxide levels inside the cab would increase to some degree, but, unless it was a rich running engine, not significantly. Obviously, they disagree on whether there was evidence of a rich running engine in the instant case.
According to Dr. McCormick, carbon monoxide can cause sleepiness at levels as low as 15 — 20%. Dr. Stafford, plaintiffs’ toxicologist, explained that a person breathing carbon monoxide “may just sort of drift off and go to sleep, become unconscious.”
Contrary to the safety instructions Rainwater believed should have been given to Cecil Masters, there was no ventilation in Masters’ truck on this cold morning as the windows were up and the heater was on. Considering all of these circumstances, we find that the only reasonable explanation for what occurred is that carbon monoxide from the exhaust leak induced Eric Masters to “drift off and go to sleep”and was a substantial cause of the accident. Having disposed of this threshold question, we will proceed to examine the liabilities of the parties.

Ford Motor Company

The Louisiana Products Liability Act (“LPLA”) establishes the exclusive theories of liability for manufacturers for damage caused by their products. La. R.S. 9:2800.52. The Act’s exclusivity eliminates a general negligence cause of | (¡action and limits redhibition rights to economic losses. La. R.S. 9:2800.53(5). See Draten v. Winn Dixie of Louisiana, Inc., 94-0767 (La.App. 1st Cir. 03/03/95), 652 So.2d 675.
As applicable in this case, the Act imposes strict liability on a manufacturer for damages proximately caused by an unreasonably dangerous characteristic of its product that existed when the product left the manufacturer’s control and arising from a reasonably anticipated use of the product. La. R.S. 9:2800.54.
The question presented in this case is whether the truck was made unreasonably dangerous by some error in its construction or assembly. The Act provides that a product is unreasonably dangerous in construction or composition if, at the time it left the manufacturer’s control, it deviated in a material way from ■ the manufacturer’s specifications or performance standards. La. R.S. 9:2800.55.
In Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La.1986), the supreme court held that a product was unreasonably dangerous when an unintended defect made the product more dangerous than it was designed to be. Thereafter, the LPLA was enacted and defined “unreasonably dangerous” as a material deviation from the manufacturer’s specifications or standards. The purpose of the mismanufaeture category is to protect consumers from unintended errors in *192 the manufacturing process that make a product unsafe. Any deviation that increases the propensity for injury is material. Therefore, we find that the Act’s material deviation standard encompasses the pre-act rule, as stated in Halphen, supra, and that any flaw that makes a product more dangerous than intended is a material deviation. See Thomas C. Galligan, Jr., The Louisiana Products Liability Act: Making Sense Of It All, 49 La. L.Rev. 629 (1989). Exactly what the flaw is can be shown by circumstantial evidence. Jurls v. Ford Motor Credit Company, 32,125 (La.App.2d Cir.01/06/00), 752 So.2d 260.
|7In our original opinion, we found that there was an exhaust leak at the connection between the EGR tube and the EGR valve. The break was not in the tube but on the valve threads. This was due to a fracture caused either by over tightening or because the flanges on the valve and tube were mismatched. The evidence convincingly ruled out the collision as a cause of the fracture. Plaintiffs’ expert metallurgist found that the fracture was from pulling apart or tearing rather than shearing. Further, there was no other damage to the tube or valve, as would have been expected if the collision had played any part in the fracture. Plaintiffs’ expert concluded that the threads were stripped by over tightening which caused enough damage or stress to eventually crack after some use.
The truck was purchased new; after a short time, the purchaser, Cecil Masters, returned the truck to the dealer and described problems which caused the dealer’s mechanic to look for an exhaust leak. Masters suffered symptoms of carbon monoxide exposure before bringing the truck back to the dealer. There was no evidence that any work, other than ordinary maintenance, had been done on the truck before it was brought to the dealer with the complaints. Finally, the dealer’s mechanic, Randy Rainwater, found the leak before he attempted to tighten the connection. The only reasonable explanation for the overload fracture is that it occurred during the manufacturer’s assembly process. See Hunt v. Ford Motor Company, 341 So.2d 614 (La.App. 2d Cir.1977).
As described by Rainwater, this defect made the truck more dangerous than intended and thus, was material. Before any serious problems or injuries occurred, however, the truck was checked by the dealer, Courtesy Ford, and the leak was found. Because a manufacturer is not liable for damages brought about by a later intervention of a separate, independent, superseding cause, we must discuss Courtesy Ford’s negligence and whether it was such a superseding cause.
| RCourtesy Ford
In pre-trial discovery, Courtesy Ford was vague in disclosing Rainwater’s involvement and claimed a work product exception in refusing to produce his statement. Because of the telephone call to Judy Masters after the accident, plaintiffs knew that an EGR tube had been ordered for the vehicle. In discovery answers, Courtesy Ford claimed that the EGR tube was ordered “because the buildup of carbon deposits results in poor engine performance.” At best, this answer was deceptive.
Ironically, finding the exhaust leak demonstrated Courtesy Ford’s competence, not negligence. Them fault, however, relates to whether warnings and safety instructions were necessary and, if so, whether they were given. A seller or dealer, as distinguished from a manufacturer, is not presumed to know the latent vices in the product. A retail truck dealer ordinarily owes a duty of reasonable inspection, but is not required to disassemble the vehicle or make a minute inspection for latent defects. We have found in this case that during the assembly process over tightening weakened the threaded area of the valve which eventually fractured after a short period of use. The *193 dealer’s initial inspection could not have discovered this flaw; however, the truck was returned to the dealer while under warranty and the break was found. The dealer’s liability is not based on strict liability, as is the manufacturer’s, but on negligence or knowledge. Hunt, supra.
Courtesy Ford was informed by Cecil Masters of his problems with the truck. In this instance, the dealer discovered the defect and accepted the responsibility to correct the problem. It was in Rainwater’s statement that the seeds of an effective defense were sowed. Rainwater asserted that he always gave proper warnings, but he had no specific recollection of doing so with Cecil Masters. We have no record of what actually occurred when Masters picked up his truck. Courtesy Ford objected to the use of Rainwater’s statement and ^presented no evidence that Masters was warned of an exhaust leak and instructed to ventilate the cab of the truck until the ordered part was installed. Thus, we must find Courtesy Ford negligent.

Intervening Cause

A manufacturer of a product with an unreasonably dangerous characteristic will not be relieved of liability unless an intervening cause superseded the original negligence and alone produced the injury. Foreseeable, intervening forces are within the scope of the original risk. Rather than being framed in terms of proximate causation, this is a question of duty/no duty. That is, whether, as a matter of policy, we want to extend the manufacturer’s responsibility this far to cover these circumstances. Hunt, supra; Mendoza v. Mashburn, 99-499, 99-500 (La. App. 5th Cir. 11/10/99), 747 So.2d 1159.
In this case, the flaw or defect occurred during the assembly process and was a cause-in-fact of Eric Masters drifting off to sleep and the resulting fatal accident. After finding the leak, Courtesy Ford failed to notify the customer and give safety instructions. Had Courtesy Ford done so, the accident probably would not have occurred, or, at least, the customer would have had to bear all or a large part of the blame. Courtesy Ford’s negligence, however, was not deliberate, wanton or willful, nor was it extraordinary in character. Ford Motor Company set the chain of events in motion, while Courtesy Ford had the opportunity to influence the eventual consequences. As such, both parties must share responsibility. Accordingly, we apportion 60% to the dealer and 40% to the manufacturer.

DAMAGES

Once it has been determined that the trier of fact is clearly wrong, the appellate court is empowered by La C.C.P. art. 2164 to render any judgment which is just, legal and proper. Gordon v. Willis Knighton Medical Center, 27,044 (La.App.2d Cir.06/21/95), 661 So.2d 991, writ denied, 95-2776 (La.01/26/96), 666 So.2d 679. A court of appeal may award damages when the trial court initially rejects plaintiffs demands and where the record contains sufficient proof of damages. Id. In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm; rather, we set the award in an amount which is just compensation for the damages revealed by record. Id.; Beckham v. St. Paul Fire & Marine Ins., 614 So.2d 760 (La.App. 2d Cir.1993) (citations omitted).

Wrongful Death

Cecil Master’s wife and two minor children seek damages for his wrongful death.[1] The elements of damage for wrongful death are loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Gor *194 don, supra; Cannon v. Cavalier Corp., 572 So.2d 299 (La.App. 2d Cir.1990); Watson v. C.R. Bard, Inc., 557 So.2d 739 (La.App. 2d Cir.1990).

Love and Affection

The record reveals that Cecil and Judy Masters were married on March 2, 1973, and never separated or divorced. With their two children, Eric and Ashley, they shared a very close and loving family relationship. The family enjoyed many activities together, such as vacations, picnics, ball games and church. Every year the family had a portrait made, the last of which was made in July 1989, approximately six months prior to Cecil’s death.
Since he was a child, Eric Masters and his father fished and hunted together. Eric spent a lot of time with his father and frequently helped him with his work.
Ashley Masters, who as only 10 years old when this accident occurred, had |na very close relationship with her father. Judy Masters described Ashley as a “daddy’s girl.” The two went for donuts together every Saturday morning. Cecil often helped Ashley with her homework and school projects; he built things for her and often brought her gifts. He always gave her a special valentine and candy on Valentine’s Day.
Judy Masters testified that Cecil was a skilled craftsman who had built their first house and did maintenance. Judy further testified about how lonely it was without Cecil and that she missed his love, affection and companionship.
Considering that Cecil and Judy Masters shared a close relationship, we award her $200,000 in damages for loss of love and affection. See Baughman v. State, Dept. Of Transportation and Development, 28,369 (La.App.2d Cir.05/08/96), 674 So.2d 1063, writ denied, 96-1882 (La.11/01/96), 663 So.2d 690; Reid v. State, Dept. Of Transportation and Development, 25,778 (La.App.2d Cir.05/04/94), 637 So.2d 618, writ denied, 94-1415 (La.09/16/94), 642 So.2d 198.
Further, considering the closeness of Cecil and his children, Eric and Ashley, we award $100,000 in damages to each for their loss of love and affection. See Baughman, supra.

Loss of Support

Cecil Masters was 38 years old and in good health when he was killed in this accident. In 1984, he and his brother had started their own construction and remodeling company. Factors that should be considered when determining a proper amount to award for loss of support include the decedent’s earnings at the time of his death, his age and life expectancy, the decedent’s job security, the nature of decedent’s work, the decedent’s health pri- or to his death, the decedent’s relationship with his family, the decedent’s personal expenses and his past work record. Mackie v. Lalonde, 598 So.2d 521 (La.App. 1st Cir.1992), writ denied, 600 So.2d 682 (La.1992). Other factors to consider are the surviving spouse’s age j12and health, the minor children’s age, and the effects of inflation and the need to discount future earnings to a present day amount. Id.
Both sides presented evidence from economists representing the amount that should be awarded for loss of support. Plaintiffs’ expert, Dr. Charles O. Betting-er, testified that the total loss of earnings and earning capacity at the time of Cecil Masters’ death was $871,347 less $87,135 (10%) for personal consumption, for a total of $784,212. Dr. Bettinger used gross income, a retirement age of 65 and factored in future growth for Cecil’s business.
Defendants’ economist, Dr. Ernest Mos-er, testified that Cecil’s total loss of earnings and earning capacity was $295,656.24 less $44,000 (25%) for personal consumption, for a total of $251,656.24. Dr. Moser used net income, figured Cecil’s retirement age at 60 and did not factor in future growth.
*195 The first issue is whether gross or net income should be used in determining the loss of earnings and earning capacity in a wrongful death suit. The Louisiana Supreme Court declined to address this issue in Martinez v. U.S. Fidelity and Guar. Co., 423 So.2d 1088 (La.1982), but noted that our circuits were split on the issue.
In Harris v. Tenneco Oil Co., 563 So.2d 317, 326 (La.App. 4 Cir.1990), writ denied, 568 So.2d 1062 (La.1990), the Fourth Circuit wrote:
The basis for the use of net wages in formulating a base figure for wage losses is 26 U.S.C. Sec. 104 which exempts damages for personal injuries or sickness from federal income tax liability. The reasoning behind this rule is that earnings “before taxes are never truly available” to a plaintiff. Edwards v. Sims, supra[, 294 So.2d 611 (La.App. 4th Cir.l974)7. Nonetheless, we are aware there are countervailing considerations including 1) that future tax rates are uncertain and the manner in which a particular plaintiff may be affected by them is speculative and 2) that a tortfea-sor should not benefit from an advantage accruing from a collateral source. Reeves v. La. and Ark. Rwy. Co., 304 So.2d 370 (La.App. 3rd Cir.1974), writ denied 305 So.2d 123 (La.1974).
We are satisfied that the more equitable rule is to use gross wages. Thus, Edwards, Morgan[ v. Liberty Mut. Ins. Co., 323 So.2d 855 (La.App. 4th Cir. 1975)7 and Roundtree[ v. Technical Welding and Fabrication Co., Inc., 364 So.2d 1325 (La.App. 4th Cir.1978)7 are overruled insofar as each case requires using net wages.
| iSWe agree with the Fourth Circuit’s analysis and adopt the usage of gross wages in the calculation of a base figure for wage losses. We further agree that future growth should be factored into the assessment. We, however, are not in complete agreement with Dr. Bettinger’s figures. Based on the above, we award $488,556 in lost earnings and earning capacity.

Loss of Services

The loss of services element in a wrongful death damage action is an item of special damage that requires some measurable proof (i.e., more than a showing of potential loss) of. the value or replacement cost of the services. Dixon v. Mid-South Rail Corp., 580 So.2d 438 (La. App. 2d Cir.1991), writ denied, 584 So.2d 1160 (La.1991). Therefore, when the loss of a loved one’s services is claimed as a material, compensable loss, there must be an evidentiary basis to allow the trier of fact and the appellate court to reasonably evaluate or measure monetarily the claimed material loss. Id.,
In the case at bar, plaintiffs’ economist valued Cecil Masters’ loss of services to be $123,170 and defendants’ economist valued it at $44,000. The record clearly establishes that Masters possessed carpentry and general construction skills that should certainly establish in plaintiffs the right to recover for his loss of services. The evidence also showed that he built the first house he and Judy lived in after they got married. Cecil kept the yard in order and took care of any home improvement project that arose (i.e., just before his death he had started to repair the driveway).
We find that the loss of these services represents a material and compensable loss to plaintiffs, because, in the future, these services will have to be provided by a paid professional. As we find plaintiffs’ expert more reliable, we award plaintiffs $123,170 in damages for loss of services.
We also award plaintiffs $7,433.14 in funeral expenses.
| uSurvival Action
A court may award damages for the pain and suffering of the decedent when there is any evidence, however brief, of such affliction. Cannon v. Cavalier Corp., 572 So.2d 299 (La.App. 2d Cir.1990).
*196 Although it is apparent that Masters survived the accident for a short period of time, the record indicates that he was not conscious. In fact, the record supports the contention that he was unconscious even before the accident. As such, plaintiffs have not presented sufficient evidence to show that Cecil suffered any pain and, therefore, are not entitled to recover survival damages.

Personal Injury

The record establishes that Eric Masters sustained multiple orthopaedic injuries. He suffered displaced fractures of both femurs, a reverse Colies fracture of the right distal wrist, a fracture of the left hand, multiple bone fragments in the right patella, a fracture of the right fibula, a fracture of the right heel bone and various lacerations and contusions. Eric’s doctor, Dr. C.R. Hand, determined that he had a 29% disability to the body as a result of his orthopaedic injuries. Eric underwent multiple surgeries and will suffer from pain and arthritic problems for the rest of his life.
As a result of the injuries Eric Masters sustained in this accident, we award him $300,000 in general damages and $61,-018.73 in medical expenses. See Roberts v. State, Through DOTD, 576 So.2d 85 (La.App. 2d Gir.1991); Tucker v. Finder, 93-563 (La.App. 3d Cir.02/02/94), 631 So.2d 735, writs denied, 94-0515, 94-0547 (La.04/07/94), 635 So.2d 1138; Bordelon v. South Central Bell Telephone Co., 617 So.2d 1337 (La.App. 3d Cir.1993).

SANCTIONS

In this court, plaintiffs filed a motion against defendants seeking sanctions and alleging a deliberate pattern of lying and presentation of false evidence.
115In Peterson v. Gibraltar Savings and Loan Association, Inc., 98-1601, 98-1609 (La.09/03/99), 751 So.2d 820, the Louisiana Supreme Court granted rehearing solely on the issue of whether sanctions should be imposed on the defendants and their attorneys for failure to disclose the existence of an excess insurance policy. The information was not provided until after the appellate judgment. The supreme court cited jurisprudence that courts are vested with the inherent powers to manage their own affairs and to achieve the orderly and prompt disposition of cases and that sanctions, including contempt proceedings and/or the assessment of attorney fees and costs, could be imposed on attorneys who wilfully failed to disclose discoverable materials. In Peterson, the court found it necessary to remand the case to the district court for a contradictory hearing to determine what, if any, sanctions were appropriate. The court stated that the scope of the hearing should encompass all issues relevant to the nondisclosure of the excess policy.
Peterson is similar to the instant case in that we are faced with a claim for sanctions that could not have been raised until after the case was on appeal. Furthermore, another parallel appears to be that additional evidence is necessary in order to determine whether or not sanctions are appropriate.
We therefore remand this matter to the district court with instructions to conduct a hearing in which defendants and their attorneys are ordered to show cause why they should not be held in contempt of court and/or sanctioned for discovery violations.

DECREE

IT IS ORDERED, ADJUDGED and DECREED that there be judgment in favor of Judy Masters in the full sum of $819,159.14; in favor of Ashley Masters in the full sum of $100,000; and in favor of Eric Masters in the full sum of $461,018.73 ($100,000 plus $361,018.73) and against defendants in the following | ^proportions: Courtesy Ford and its insurer, U.S. Fidelity & Guaranty Insurance Company, 60% and Ford Motor Company, 40%. All *197 awards are subject to legal interest from the date of judicial demand.
IT IS FURTHER ORDERED that this matter be remanded to the trial court for a determination of whether sanctions are appropriate.
All costs both below and in this court are assessed against defendants.
CARAWAY and KOSTELKA, JJ„ dissent for the reasons set forth in the original opinion.

. We note that both children are now majors. Ashley Masters was still a minor at the time of trial.