645 So.2d 231 (1994)
William OBER and Rachael Ober, Plaintiff-Appellant,
v.
CUNA MUTUAL SOCIETY d/b/a Cuna Mutual Insurance Agency, Defendant-Appellee.
No. 26208-CA.
Court of Appeal of Louisiana, Second Circuit.
October 26, 1994.
*232 Madeleine M. Slaughter, Monroe, for appellant.
Theus, Grisham, Davis & Leigh by F. Williams Sartor, Jr., Monroe, for appellee.
Before MARVIN, C.J., and SEXTON and BROWN, JJ.
MARVIN, Chief Judge.
In this action on an accidental death and dismemberment insurance policy the policy beneficiaries, who are the parents of the insured-decedent, appeal a judgment applying the policy provision that the proceeds are not payable when "the loss to the insured person [is] caused by or resulting from ... operating a motor vehicle while intoxicated."
Appellants contend the trial court was clearly wrong in finding that the insured was driving his truck while he was intoxicated when the accident occurred and that his intoxication was a contributing cause of the accident. They additionally complain of the trial court's evidentiary rulings relating to blood alcohol tests and opinion evidence and assert that the insurance policy was ambiguous and should have been construed against the insurer, CUNA.
We find no merit in the assigned errors and affirm the judgment.

FACTS
The insured, Warren Ober, suffered fatal injuries in a single vehicle accident on U.S. Highway 49 near Gulfport, Mississippi, at about 4:00 p.m. on February 21, 1990. His truck left the road, hit several trees, and flipped over, throwing Ober and his passenger, Robert Leith, from the truck. Leith survived. The roadway was wet from an earlier rain. The only other witness of the accident was the driver of a vehicle that was following Ober's truck, who was noted on the accident report but did not testify at the trial.
Officer Danny Tackett of the Mississippi State Police investigated the accident and wrote an accident report. At a hospital emergency room in Gulfport, Officer Tackett directed that blood be drawn from the unconscious Ober for a routine blood-alcohol analysis because he found beer cans, some empty, some full, scattered around the truck at the accident scene. Nurse Jo Lynn Bourgeois drew two vials of blood, putting them in a blood-alcohol test kit. No blood was drawn *233 from Leith, who was conscious at the hospital. Ober died after the blood was drawn.
The accidental death and dismemberment policy written by CUNA named William and Rachael Ober as Ober's beneficiaries.

WAS OBER THE DRIVER?
Ober and Leith left Ouachita Parish about 10:00 a.m. on the day of the accident in Ober's truck, intending to drive to Florida to attend the wedding of Leith's brother. They bought and iced down two cases of beer before departing. The plan was to drive straight through, with Ober driving during the day and Leith driving at night.
Leith says he was sleeping while Ober drove. He further testified Ober had consumed "at least" two beers before the accident. The trial court specifically found Leith's testimony credible, notwithstanding the fact he was a two-time felony offender. Appellants argued below and here that Leith was driving Ober's truck.
Officer Tackett implicitly concluded Ober was the driver. Even if the information in Tackett's police report is deemed inadmissible hearsay, the trial court could have inferred that Tackett concluded Ober was the driver because Tackett requested the blood-alcohol test only of Ober's blood, not Leith's. A trial court's findings and inferences based on fact are entitled to great weight and will not be disturbed absent clear error. Rosell v. ESCO, 549 So.2d 840 (La.1989).
We cannot say the trial court was clearly wrong in finding Ober was the driver of the truck.

OBER'S INTOXICATION
Despite the factual finding that Ober was driving at the time of the accident, the appellants still would have prevailed unless Ober was intoxicated at the time of the accident. Officer Tackett requested a blood-alcohol analysis of Ober's blood. The trial court findings indicate the trial court concluded the blood was Ober's, it contained alcohol, and the amount of alcohol rose to the level of intoxication within the meaning of the policy exclusion.

A. IDENTITY OF THE BLOOD TESTED
The blood drawn from Ober was handled by seven people. Nurse Jo Lynn Bourgeois drew the blood and gave it to Officer Tackett. He took it to Betty Dedeaux, an evidence technician at the Gulfport crime lab, from where another evidence technician, Alison Smith, transported it to the Jackson crime lab. Smith gave the sample to her Jackson counterpart, Bonnie Arinder. Sam Howell, supervisor of toxicology at the Jackson lab, performed the blood-alcohol tests. The blood sample was still at the Jackson lab when Howell was deposed.
Each of the parties in the chain of custody, who testified by deposition, stated that he or she had no independent recollection, aside from the laboratory records, of the events surrounding the blood samples and the tests. We agree that these persons could not testify to what they did with the samples. LCE Art. 602. Each could testify, however, to standard operating procedures even without an independent recollection of how he or she handled the samples.
The routine practice of an organization, whether corroborated or not, and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of that organization on a particular occasion was in conformity with the routine practice. LCE Art. 406.
The records concerning the blood and the test kit that each of these witnesses used and discussed in his or her deposition testimony are admissible as a hearsay exception. Records concerning a matter about which a witness once had knowledge but now has insufficient recollection to testify fully and accurately, made or adopted by the witness when the matter was fresh in his or her memory and reflecting that knowledge correctly, are not excluded by the hearsay rule. LCE Art. 803(5). The implied consent form, the blood test kit including the writing on it and in it, the evidence submission form, the evidence transfer sheet, the entries in the forensic log, and the test results were properly before the court.
Every person in this chain of custody is employed in a respective occupation that is *234 responsible for blood-alcohol testing in the routine circumstances in this record. There is no reason for these persons to have an independent recollection of what they did with respect to their routine responsibilities. Each of the deponents had specific responsibilities within the chain of custody to record accurately and to handle samples carefully to ensure professional integrity. Absent any showing to the contrary, the court was entitled to treat these witnesses as having acted in accordance with their respective duties and their respective routines.
Officer Tackett asked for a routine blood-alcohol test on Ober, following standard procedure in an accident where the officer suspects the driver was intoxicated. Nurse Jo Lynn Bourgeois identified the writing on the implied consent form, the blood-alcohol test kit, and the gray-topped tubes on the vials of blood, each of which was secured or sealed with red evidence tape in the test kit. Bourgeois explained these writings indicate she drew blood from the patient identified as Warren Ober. She routinely identifies unconscious patients by their hospital identification bands that are routinely generated and attached to patients as they enter the emergency room. Absent any affirmative evidence to the contrary, these circumstances allow the conclusion that the blood drawn was Ober's. LCE Art. 406. Routinely, the officer directing or requesting the sample observes the nurse drawing the blood in vials, which are then given to the officer to take to the crime lab.
The evidence submission form indicates Officer Tackett transferred the blood test kit containing the vials of Ober's blood in two red-topped tubes to the Gulfport crime lab on March 5, 1990, twelve days after the blood was drawn. He testified there was no hurry because there would be no criminal investigation because the "perpetrator" had died. He also testified he was in continuous possession of his patrol car, where the test kit was placed, at all times. Blood test kits are placed in the trunk of Tackett's patrol car from the time he receives them at the hospital until he removes the kits at the crime lab. Officer Tackett's status as an expert in accident investigation is immaterial to his being in the chain of custody of Ober's blood test kit.
The evidence technician at the Gulfport crime lab, Dedeaux, testified the evidence submission form indicates she accepted the blood in accordance with the crime lab's standard operating procedure. She explained that blood samples are kept refrigerated inside a vault at the Gulfport lab for later transfer to the Jackson lab. A blood sample's integrity is generally preserved by an inert chemical in the vials of the test kit for that purpose. This record explains that if blood is affected at all by not being refrigerated for an extended time, the alcohol content of the blood would be reduced, not increased.
The evidence transfer sheet indicates that Alison Smith, a technician at the Gulfport lab, transported Ober's test kit and blood samples, along with numerous other unrelated items, to the Jackson lab where she gave the blood samples to Bonnie Arinder, an evidence technician.
Arinder's standard procedure is to check each item on the transfer sheet against the containers she receives. Blood sample kits are placed in the cooler in the Jackson lab where they remain until being removed for testing. When putting a kit in the cooler, Arinder places the paperwork associated with the kit in the basket on the desk in the forensic office to alert the forensic scientist to the presence of the kit in the cooler and the tests requested for that kit or sample.
According to the forensic log, Sam Howell, the supervisor of toxicology, tested the blood sample that was marked as Ober's. Using a gas chromatograph, he tested two samples of blood from one of the two gray-topped vials sealed with the red evidence tape. He thereafter resealed the test vial with tape, secured both vials in the kit, and sealed the kit itself. Howell then returned the test kit to a cooler in the vault where samples that have been tested are kept. Howell's tests revealed at least .11 grams percent blood-alcohol level.
Ober's blood test kit remained in the Jackson lab cooler until the depositions, because of a request by the litigants in this appeal. Absent a showing that one or more of the *235 deponents in this chain of custody acted in some way not in accordance with standard procedure or in violation of their respective routine responsibilities, CUNA met its burden of showing that it is more probable than not that the blood tested in Jackson was Ober's blood.
Although breaks in a chain of custody are possible, appellants have shown no evidence of such a break in the chain. The discrepancy in the color of the tube tops was specifically resolved by the trial court's conclusion that the words "red-topped tubes" on the evidence submission form refer to the red evidence tape sealing the gray-topped tubes. This finding is clearly warranted by the record.
Appellants argue that the evidence pertaining to the blood, including the test results, should not have been admitted because CUNA failed to show with certainty that the blood tested was in fact Ober's blood. Admissibility is a question of law to be determined by the court. LCE Art. 104(A). We find no error.
Before blood-alcohol tests can be admitted in a civil proceeding, the party seeking to introduce the evidence must lay a proper foundation. This is accomplished by showing a connection between the specimen and the source, that the specimen was properly labeled and preserved, properly transported for analysis, properly taken by an authorized person, and properly tested. Lee v. Missouri Pacific R. Co., 566 So.2d 1052 (La.App. 2d Cir.1990), writ denied; Bufkin v. Mid-American Indem. Co., 528 So.2d 589 (La.App. 2d Cir.1988).
While a hospital patient may be misidentified, appellants have not produced any evidence to indicate this might have occurred at the Gulfport hospital. Whether Ober's blood was drawn by Nurse Bourgeois or someone under her supervision is of no moment. Likewise, if Ober's blood became too warm in the trunk of Officer Tackett's car during the twelve days it remained there, the blood-alcohol level would have decreased, thus benefitting the appellants.
The record is devoid of any evidence that rebuts CUNA's preponderant showing that the blood tested was Ober's blood.

B. BLOOD-ALCOHOL LEVEL OF THE DRIVER
Sam Howell tested Ober's blood using a gas chromatograph. He found the blood-alcohol levels in the two samples drawn from a single vial to be .1192 and .1188. Howell established the blood in the vial tested had at least .11 grams percent alcohol content.
The trial court accepted Dr. David Roane, assistant professor of pharmacology at Northeast Louisiana University School of Pharmacy in Monroe, as an expert in pharmacology and physiology. Expert testimony is admissible to help the trier of fact to understand the evidence or to determine a fact at issue. LCE Art. 702.
Even being of assistance to the trier of fact, expert testimony may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the trier of fact. LCE Art. 403. Because this was a bench trial and the exclusion provisions are permissive and not mandatory, we find no error in the trial court accepting Dr. Roane as an expert.
Dr. Roane testified about Ober's likely blood-alcohol level at the time of the accident. Using the results from the tests Howell ran, he opined that Ober's most likely blood-alcohol level at the time of the accident was .1492, with the level definitely falling between .12 and .15. He based his opinion on the premise that Ober's blood-alcohol level at the time of the accident projected to .12. He explained that if the vials had gotten hot or had been perforated in some way, some of the alcohol would have escaped or evaporated, with the result being that the actual blood-alcohol level at the time of the accident would have been higher than the projected.12.

C. AMBIGUITY OF THE POLICY
Appellants argue the policy is ambiguous because it fails to define the word intoxicated. Dr. Roane testified even a .12 reading *236 is considered "decidedly drunk," that is, having a measurable loss of motor control. Dr. Roane concluded this level of intoxication in a driver would likely be a contributing cause of any accident involving that driver. In Louisiana, a person with a blood-alcohol level of .10 is legally intoxicated. LRS 14:98 A(2). Even if the term intoxication is ambiguous, it is still sufficiently specific to include one who is "decidedly drunk" or legally intoxicated. The trial court found Ober was intoxicated within the meaning of the policy.
We find no error in the trial court's conclusion that Ober was driving while intoxicated at the time of the accident.

CAUSATION
After direct examination and cross examination in a deposition, Officer Tackett was thereafter questioned as an expert in accident investigation, subject to appellants' timely objection to him being so qualified. CUNA's counsel asked if Officer Tackett had made a determination of or formed an opinion about what caused Ober's truck to leave the road. Officer Tackett replied he had no idea. Whether or not Officer Tackett qualified as an expert in accident investigation is immaterial to a determination of the cause of Ober's death.
Appellants argue that Ober's death was caused, not by his driving while intoxicated, but by excessive blood loss. This glosses over the fact that the massive blood loss was caused by injuries sustained in the accident which occurred while Ober was driving while intoxicated. CUNA need not eliminate all other possible causes of the accident to invoke the policy exception. The language of the policy says "caused by or resulting from." A fair construction in the ordinary sense of this language encompasses driving while intoxicated as a contributing cause of the accident. LSA-R.S. 1:3.
Dr. Roane reached no conclusion about the cause of the accident. He explained, however, that the person from whom the blood was drawn, if of Ober's height, weight and age, would be forty times more likely to be in a one car accident if he had the .12 grams percent blood-alcohol level than a person who had had nothing to drink. This enhanced likelihood, combined with the facts that no other car was involved and the road was straight with no noticeable defects, was sufficient to meet CUNA's burden. Appellants failed to establish that the accident, or Ober's loss of control, was caused other than by Ober's intoxication.

DECREE
Having found the trial court's conclusions were not clearly wrong, and at appellants' cost, we
AFFIRM.