IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

F I L E D

July 10, 2008

Charles R. Fulbruge III
Clerk

No. 07-30946

PAMELA DEAN SMITH

Plaintiff - Appellant

v.

LIBERTY LIFE INSURANCE COMPANY

Defendant - Appellee

Appeal from the United States District Court
for the Western District of Louisiana

Before PRADO, ELROD and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:

Whitney Blaine Smith was killed when the truck he was driving left the road and collided with two trees. Mr. Smith, a long time drug addict, had potentially lethal levels of the drug hydrocodone in his system at the time of the crash. His wife, Pamela Dean Smith, filed this lawsuit seeking coverage under an accidental death insurance policy. The district court granted summary judgment in favor of the insurer holding that Mrs. Smith's claims were barred by language in the policy that excluded coverage of any death resulting directly or indirectly from drug use. We affirm.

I. BACKGROUND

This suit arises from an insurance policy (the "Policy") issued and delivered to Saxon Mortgage Services, Inc. ("Saxon") by Liberty Life Insurance Company ("Liberty") on February 11, 2002. Saxon is the only policyholder. Under the Policy, Saxon was permitted to offer coverage to debtors of mortgages that it serviced on behalf of other lenders. If a debtor enrolled, the Policy paid off the debtor's mortgage balance in the event of an accidental death of the insured. But the Policy did not cover all accidents. It contained an exclusion for any "death which results directly or indirectly, in whole or in part, from: . . . (e) injury occurring while under the influence of alcohol, or (f) drugs (including but not limited to narcotics, hypnotics, and amphetamines), unless administered on the advice of a physician . . . ."

In March of 2004, the Smiths enrolled under the Policy to cover a mortgage held by JPMorgan Chase Bank ("JPMorgan") and serviced by Saxon. Saxon collected the first month's premium as part of the Smiths' mortgage payment, but the Smiths did not make any further payments on the Policy.

Mr. Smith had a twenty-year history of severe drug and alcohol abuse. For example, he was admitted to Brentwood Hospital for drug and alcohol detoxification on July 17, 2004, just six weeks before his death.[1] At the time of his admission, Mr. Smith described a history of abusing the drug hydrocodone. According to his admitting physician, Larrie Williamson, M.D., Mr. Smith was regularly taking potentially lethal doses of hydrocodone prior to his admission. Mr. Smith was discharged on July 26, 2004. One month later, Mr. Smith was driving his truck when it went off the road and struck two trees. He died from injuries suffered in the accident.

Although trauma was listed as the primary cause of Mr. Smith's death, an autopsy report prepared by Cameron Snider, M.D., also listed acute ethanol and

---

[1] Mr. Smith reported to his physician that he had been arrested for his seventh DWI just prior to his admission to Brentwood.

multi-drug intoxication as contributing causes. Post-mortem toxicology results reflected 1.0 micrograms/gram of hydrocodone in Mr. Smith's system at the time of the accident, which Dr. Snider testified was a potentially lethal amount of the drug. Mr. Smith also had .54 micrograms/gram of diazepam in his system. Dr. Snider testified that the diazepam and hydrocodone in Mr. Smith's system would have caused drowsiness, slowed mental activity, decreased alertness, and slowed reflexes. According to Dr. Snider, the drugs impaired Mr. Smith's normal mental and physical faculties, including his ability to operate a motor vehicle. Dr. Snider opined that the drugs in Mr. Smith's system caused the accident that led to his death.

After the accident, Mrs. Smith submitted a claim to Liberty under the Policy. Liberty denied the claim, and this lawsuit resulted. Liberty filed a motion for summary judgment based on its theory that the intoxication exclusion barred coverage. In support of the motion, Liberty submitted undisputed evidence showing that the drugs in Mr. Smith's system at the time of his death were not taken on the advice of a physician.

In response to Liberty's motion for summary judgment, Mrs. Smith argued that the intoxication exclusion should not apply because she never received a copy of the Policy. She also argued that she raised a question of material fact concerning the cause of Mr. Smith's death.

Liberty replied by submitting a declaration from Michael Wojahn, who attested to the standard business practices of Chartered Benefit Services, Inc. ("Chartered"), the third-party administrator for the Policy, and Intersections Insurance Services, Inc. ("IISI"), Chartered's successor. Mr. Wojahn stated that Chartered's business records showed that a certificate of insurance was printed and mailed to the Smiths on March 18, 2003. In response, Mrs. Smith filed a motion to strike Mr. Wojahn's declaration, and Liberty submitted a supplemental and amending declaration from Mr. Wojahn.

On October 3, 2007, the district court issued a memorandum ruling in which it denied Mrs. Smith's motion to strike Mr. Wojahn's declaration, granted Liberty's motion for summary judgment, and dismissed the lawsuit with prejudice. Mrs. Smith appeals this ruling.

## II. DISCUSSION

This court reviews the grant of summary judgment de novo. Schneider Nat'l Transp. v. Ford Motor Co., 280 F.3d 532, 536 (5th Cir. 2002). The moving party is entitled to summary judgment as a matter of law when the pleadings and affidavits establish that there are no genuine issues of material fact left to resolve. Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986).

## A. The Intoxication Exclusion Is Binding On Mrs. Smith

Under Louisiana law, if the insurer fails to deliver a copy of the policy or certificate of insurance as required by law, the insured is not bound by the exclusions contained in the policy. La. Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London, 616 So. 2d 1250, 1253 (La. 1993). Mrs. Smith argues that Liberty was required to deliver to her a copy of the Policy by certified mail, something Liberty admits it did not do. In the alternative, Mrs. Smith argues that the district court erred in considering evidence of Liberty's business practices in deciding that Liberty proved delivery of the certificate of insurance.

### 1. Delivery By Certified Mail Was Not Required

Louisiana law has different delivery requirements for individual and group or blanket accident insurance policies. Mrs. Smith argues that the Policy was an individual accident insurance policy that must be sent to the policyholder by certified mail. See LA. REV. STAT. ANN. § 22:212(7)(c).[2] Liberty argues that the

---

[2] The statute governing Liberty's duty under the Policy is the statute that was in effect when the policy was issued. Gahn v. Allstate Life Ins. Co., 926 F.2d 1449, 1455 (5th Cir. 1991). This policy was issued in 2003, so we refer to the 2003 versions of all Louisiana Revised Statutes unless otherwise noted.

Policy was not subject to the certified mail requirement because it was a group or blanket accident insurance policy. See LA. REV. STAT. ANN. § 22:221(B). "Members of a group insurance plan are generally not supplied with a complete copy of the master policy but are instead given a certificate of insurance that describes the master policy." Clements v. Folse ex rel. Succession of Clements, 830 So. 2d 307, 312-13 (La. Ct. App. 2002).

We hold that the Policy was a blanket accident insurance policy and that delivery to the Smiths by certified mail was not required. A blanket policy is defined to include "any policy covering special groups of persons . . . [u]nder a policy or contract issued to a creditor who shall be deemed the policyholder to insure debtors of the creditor. . . ." LA. REV. STAT. ANN. § 22:215(A)(3)(e). The Policy, which has language that describes its nature as a group insurance policy, was sold to the Smiths to pay their mortgage in the event of an accidental death. Saxon, as servicer of the mortgage, was named the policyholder. Both the relationship between Liberty, Saxon and the Smiths and the Policy itself show a clear intent for the Policy to operate as a group or blanket policy.

This case is very similar to the facts considered by the Louisiana Court of Appeals in Clements. See 830 So. 2d at 313. In Clements, the plaintiff purchased a CNA group policy from a telemarketer through an offer by her credit card company. Id. at 310. After enrolling, a third-party administrator for the group policy mailed the plaintiff a certificate of insurance describing the terms of the master group policy. Id. The Louisiana Court of Appeals held that the policy was a group blanket policy because it was issued by an insurer to a central entity for the benefit of a group with some relationship to the central entity. Id. at 313. Like the credit card company in Clements, Saxon serves as a "central entity between the insurer and the insured." Id. at 312.

Mrs. Smith argues that the outcome in the case at hand should be different because Saxon was the policyholder and JPMorgan was her creditor.

Mrs. Smith's argument fails to consider the role of Saxon as a servicing agent for JPMorgan. See 12 U.S.C. § 2605(i)(2)&(3) (defining servicer and servicing). As servicing agent, Saxon stepped into the shoes of JPMorgan for these matters.

Liberty also argues that, at an earlier stage of the case, Mrs. Smith successfully persuaded the district court that the policy was a "credit health and accident insurance" policy to avoid summary dismissal of her suit,[3] and that she may not now argue that the Policy was subject to the certified delivery requirements of a "life insurance policy" or a "health and accident insurance policy." This appears to be an argument based upon judicial estoppel. "'Judicial estoppel applies to protect the integrity of the courts--preventing a litigant from contradicting its previous, inconsistent position when a court has adopted and relied on it.'" Ahrens v. Perot Sys. Corp., 205 F.3d 831, 833 (5th Cir. 2000) (quoting Afram Carriers, Inc. v. Moeykens, 145 F.3d 298, 303 (5th Cir. 1998)). Because we conclude that the Policy was a blanket policy such that delivery by certified mail was not required, we need not reach this issue.[4] The district court correctly held that Liberty was not required to deliver a copy of the Policy to the Smiths by certified mail.

---

[3] Nearly three full months passed between the only payment the Smiths made on the Policy and Mr. Smith's fatal accident. The policy states that insurance will cease "at the end of the period for which premiums have been paid." Liberty filed a motion for summary judgment based on cancellation of the policy. Mrs. Smith responded by arguing that notice of cancellation was required because the policy was a "credit health and accident insurance" policy. If the policy was a "life insurance policy" or a "health and accident insurance policy," rather than a "credit health and accident insurance" policy, then the policy would be excepted from the requirement of a notice of cancellation under LA. REV. STAT. ANN. § 22:636(E) and dismissal would have been required. See Matthews v. Business Men's Assurance Co., 478 So. 2d 634, 636 (La. Ct. App. 1985) (holding that policy was properly cancelled for non-payment without notice to insured). In her response to that summary judgment motion, Mrs. Smith admitted that "if Louisiana law does not require a notice of cancellation under the circumstances of this case, Liberty would be entitled to a summary dismissal of plaintiff's suit."

[4] For this same reason, we need not reach Liberty's argument that the statute cited by Mrs. Smith, LA. REV. STAT. ANN. § 22:212(7)(c), only requires delivery by certified mail to the policyholder, which was Saxon, not the Smiths. No party disputes that Saxon received a copy of the Policy.

2. **The District Court Properly Considered Liberty's Evidence Of Delivery**

While delivery by certified mail is not necessary, Liberty does not contest that it was obligated to send a certificate of insurance to the Smiths under LA. REV. STAT. ANN. § 22:634.[5] See King v. Pan Am. Life Ins. Co., 324 So. 2d 535, 537 (La. Ct. App. 1975) (holding that delivery of policy to group policyholder and delivery of certificate of insurance to individual insureds satisfied Section 22:634). Mrs. Smith asserts that neither she nor her husband received a certificate of insurance.

To demonstrate the delivery of the certificate of insurance to the Smiths, Liberty offered the declaration of Mr. Wojahn, a Policy Services Supervisor employed by Chartered, Liberty's former third-party administrator, and IISI, Chartered's successor. On appeal, Mrs. Smith argues that the district court improperly considered Mr. Wojahn's declaration. We review the district court's admission of evidence in support of a motion for summary judgment for abuse of discretion. Triple Tee Golf, Inc. v. Nike, Inc., 485 F.3d 253, 265 (5th Cir. 2007). We hold that the district court did not abuse its discretion in considering Mr. Wojahn's declaration.

Mr. Wojahn attested that he held the position of Policy Services Supervisor since 2000, that he had "personal knowledge of the process and system used by Chartered to process and mail the certificates of insurance issued under the group policy written by Liberty . . . for Saxon," that the records were "made

---

[5] The parties disagree over who bears the burden of proving delivery. Mrs. Smith cites Landry v. J.C. Penney Life Ins. Co., 920 F. Supp. 99, 101 (W.D. La. 1995), which holds that the burden is on the insurer to prove reasonable steps have been taken to deliver the policy. Liberty cites Meche v. Wash. Life Ins. Co. of Am., 578 So. 2d 239, 241 (La. Ct. App. 1991) and Vidrine v. Travelers Ins. Co., 488 So. 2d 305, 309 (La. Ct. App. 1986), in which the Louisiana Court of Appeals held that the party claiming non-delivery must establish non-delivery by a preponderance of the evidence. We need not reach the question of who bears the burden of proving delivery. We hold that Liberty adequately established delivery of the certificate of insurance, regardless of which party bears the burden.

contemporaneously with the dates set forth in the records," and that, in the course of performing his duties at both companies, he regularly relied on the accuracy of the records at issue. Mr. Wojahn's declaration stated that Liberty sent the Smiths a copy of the certificate of insurance on March 18, 2003, three days after they enrolled. The address for delivery was correct, and Mrs. Smith does not direct this court to any evidence raising questions concerning Chartered's regular business practice of sending certificates of insurance.

The documents relied on by Mr. Wojahn and attached to his declaration were prepared in the course of regularly conducted business activity, and thus were admissible business records. FED. R. EVID. 803(6). Louisiana courts have long held that evidence like that offered by Mr. Wojahn establishes delivery of an insurance document, even if the insured denies receipt of the document. See, e.g., Meche, 578 So. 2d at 241; Vidrine, 488 So. 2d at 309; accord Landry, 920 F. Supp. at 102.

For example, in Meche, the plaintiff testified that she never received a copy of the group policy purchased through her auto club. 578 So. 2d at 240. The trial court determined that the insurance company failed to prove delivery, and, therefore, found coverage under the policy despite a relevant exclusion. Id. at 241. The Louisiana Court of Appeals reversed the trial court and rendered judgment in favor of the insurer. Id. at 242. The court of appeals held that the mere assertion by the policyholder that she did not receive the policy was insufficient as a matter of law to overcome evidence of the insurer's regular business practice of sending a certificate of insurance. Id. at 240-41.

Mrs. Smith also argues that Mr. Wojahn's declaration was deficient because it did not attach the audits mentioned in it. Under Federal Rule of Civil Procedure 56(e), "papers" referenced in an affidavit must be attached to the affidavit. However, Mr. Wojahn did not reference a "paper." Instead, he stated: "[S]everal insurance companies . . . , including Liberty, periodically audited the

systems and procedures used by Chartered and IISI during the time I have worked [there]." He then noted: "Those audits have not resulted in any complaints about deficiencies or failures about the process or procedures used by Chartered/IISI for delivery of insurance policies and certificates of insurance." Thus, he testified of his own personal knowledge about the absence of any complaints following audits rather than to the contents of "papers" stating the results of such audits. As such, Rule 56(e)'s requirement does not apply. See Doddy v. Oxy USA, Inc., 101 F.3d 448, 463 (5th Cir. 1996) (holding that district court properly relied on affidavit describing terms of purchase of assets although contract for sale was not attached because "the affidavit merely asserts that [the witness] has personal knowledge of the sale").

The district court did not abuse its discretion in considering the declaration of Mr. Wojahn. Liberty has adequately established delivery of the certificate of insurance for purposes of summary judgment.

B.     The Intoxication Exclusion Bars Mrs. Smith's Claims

Having decided that the intoxication exclusion is binding, we must now decide if Liberty has established that there is no question of material fact that the exclusion bars Mrs. Smith's claims.

LA. REV. STAT. ANN. § 22:213(B)(10) gives insurers the option to include certain enumerated provisions in their policies and provides in pertinent part as follows:

> Other provisions (optional). No such policy shall be delivered or issued for delivery containing provisions respecting the matters set forth below unless such provisions are, in substance, in the following forms, or, at the option of the insurer, in forms which in the written opinion of the commissioner of insurance are not less favorable to the policyholder:
>
> . . .
>
> (10) Intoxicants and narcotics: The insurer shall not be liable for any loss sustained or contracted in consequence of the insured's

being intoxicated or under the influence of narcotics unless administered on the advice of a physician.

The intoxication exclusion contained in the Policy provides that no coverage is provided for a "death which results directly or indirectly, in whole or in part, from: . . . (e) injury occurring while under the influence of alcohol, or (f) drugs (including but not limited to narcotics, hypnotics, and amphetamines), unless administered on the advice of a physician . . . ." The district court determined that the intoxication exclusion in the Policy could be interpreted less favorably to insureds than the language contained in LA. REV. STAT. ANN. § 22:213, so it applied the statute and held that Section 22:213 barred Mrs. Smith's claims.

Mrs. Smith, relying on cases from other states, contends that Liberty was required to prove that Mr. Smith's intoxication was the cause of the accident. Olson v. Am. Bankers Ins. Co. of Fla., 35 Cal. Rptr. 2d 897 (Cal. Ct. App. 1994); Cummings v. Pac. Standard Life Ins. Co., 516 P.2d 1077 (Wash. Ct. App. 1973); Interstate Life & Accident Ins. Co. v. Gammons, 408 S.W.2d 397 (Tenn. Ct. App. 1966). However, because this case is in federal court based on diversity jurisdiction, we must follow Louisiana's substantive law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Ashland Chem. Inc. v. Barco Inc., 123 F.3d 261, 265 (5th Cir. 1997).

In Louisiana, an intoxication exclusion operates where the insurance company demonstrates by a preponderance of the evidence that the insured was intoxicated to the point that he lost normal control of his mental and physical faculties and that the intoxication was a contributing cause of the accident. See Ober v. CUNA Mut. Soc'y, 645 So. 2d 231, 236 (La. Ct. App. 1994); Matthews v. All Am. Assurance Co., 226 So. 2d 181, 183 (La. Ct. App. 1969). The only Louisiana case Mrs. Smith cites in support of her argument that Liberty must show that intoxication was the only cause of Mr. Smith's death is Moore v. Cent.

Am. Life Ins. Co., 535 So. 2d 773 (La. Ct. App. 1988). In Moore, the court found no evidence that the decedent was intoxicated at the time of the fall that caused her death. Id. at 777-78. The court then noted that there was no evidence of what caused the fall. Id. at 778. The court did not hold that the insurance company must negate every other potential contributing cause in order to rely upon the intoxication exclusion.

To the contrary, in Ober, the same Louisiana appellate court that decided Moore addressed the requirement to establish a causal connection between intoxication and a single car accident. 645 So. 2d at 236. The investigating officer testified that he had no idea what caused the decedent's truck to leave the road. Id. The decedent's blood alcohol level was between .12 and .15 at the time of the accident. Id. at 235. There was expert testimony that a person such as the decedent would be much more likely to be in a single car accident than a person who had nothing to drink. Id. at 236. In addressing the intoxication exclusion, the court held: "[The insurer] need not eliminate all other possible causes of the accident to invoke the policy exception. The language of the policy says 'caused by or resulting from.' A fair construction in the ordinary sense of this language encompasses driving while intoxicated as a contributing cause of the accident." Id. (emphasis added).

Mrs. Smith also argues that the definition of "intoxicated" requires proof that Mr. Smith had a sufficient quantity of intoxicants to make him lose control of his mental and physical faculties, citing both Moore and Landry. Moore, 535 So. 2d at 777; Landry, 920 F. Supp. at 102. Reading these cases in context with other Louisiana cases, it is clear that the loss of control referenced in Moore and Landry is not the loss of all control, but rather only the loss of normal control of one's faculties. The question, then, is whether the insured had a "sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties." Matthews, 226 So. 2d at 183; see also Richard v. Am. Home

11

Assurance Co., 318 So. 2d 613, 617 (La. Ct. App. 1975). This is consistent with the Louisiana Insurance Code, which only requires proof that Mr. Smith was "under the influence" of drugs; complete loss of control is not necessary. LA. REV. STAT. ANN. § 22:213(B)(10).[6]

The facts and the issues presented in Matthews were almost identical to those presented here, except that the intoxicant was alcohol. See 226 So. 2d at 183. The blood alcohol content of the decedent in Matthews was .29 percent. Id. The plaintiffs argued there, as is argued in the instant suit, that people vary in their tolerance. Id. at 184. They successfully persuaded the trial court to accept the lay testimony that the decedent appeared to be in control of his faculties shortly before the accident, rather than the testimony of the experts that he was intoxicated. Id. They also argued alternatively that the accident resulted from the insured's failure to negotiate a curve, not from his intoxication. Id. The court of appeals reversed the trial court and rendered judgement for the insurer. Id. at 185. In determining that the insured was intoxicated, the court said:

> In order to prove that one is incapable of operating a motor vehicle by reason of intoxication, it need not be shown that he was drunk, but only that he had a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties.

Id. at 183 (emphasis added). It then held that intoxication was a contributing cause of the accident. Id. at 184.

In the case at hand, the correlation between drugs and Mr. Smith's death is uncontroverted. The undisputed evidence shows that Mr. Smith's vehicle left the road in the middle of the day for no apparent reason and struck two trees. Laboratory tests performed on liver tissue taken from Mr. Smith following his

---

[6] Defining loss of control to mean "loss of normal control" also is consistent with the definition of intoxication applied by the Louisiana Supreme Court in other circumstances, such as the negligence of a driver in an accident. See Jones v. Cont'l Cas. Co. of Chi., 169 So. 2d 50, 52-53 (La. 1964) (defining "intoxication" to mean that the driver's "mental and physical faculties were materially impaired at the time the collision occurred").

accident reflected the presence of several drugs, including a potentially lethal level of hydrocodone. Dr. Snider, a board-certified forensic pathologist, performed an autopsy on Mr. Smith and testified that the diazepam and hydrocodone in Mr. Smith's system would have caused drowsiness, slowed mental activity, decreased alertness, and slowed reflexes. According to Dr. Snider, the drugs impaired Mr. Smith's normal mental and physical faculties, including his ability to operate a motor vehicle. He opined that acute ethanol and multi-drug intoxication were, at the very least, a contributing cause of his death.

The only evidence offered by Mrs. Smith to refute the conclusion that drugs were a contributing cause of Mr. Smith's accident was the opinion of Dr. Williamson that it is possible that Mr. Smith could have a level of hydrocodone in his system that would impair a non-drug user but that may not impair Mr. Smith. Dr. Williamson's generalized testimony regarding tolerance was insufficient to create a genuine issue of material fact because she refused to apply it to the relevant facts or to contradict Dr. Snider's opinion of intoxication. When asked about Mr. Smith's intoxication at the time of the accident, Dr. Williamson refused to express an opinion. She testified that Mr. Smith was not immune to the effects of hydrocodone and that she had personally observed that Mr. Smith's drug use in the past affected his mental and physical faculties and would have affected his ability to operate a motor vehicle. Dr. Williamson's testimony about Mr. Smith's tolerance in general was not linked to the level of intoxication demonstrated by the undisputed evidence on the date of the accident. Therefore, it failed to create a question of material fact concerning the specific issue before the court, i.e., Mr. Smith's level of intoxication at the time of the accident.

Mrs. Smith also contends that Mr. Smith's accident may not have been the result of intoxication, but instead may have been the result of "a fourteen year

old pickup truck with considerable play in the steering" coupled with high speed and trees too close to the road. She argues that this is a remaining genuine issue of material fact that should be left for jury determination. It may be true that other factors contributed to Mr. Smith's accident, but, as explained above, Liberty was not required to prove that intoxication was the only cause of Mr. Smith's death. All Liberty was required to prove was that intoxication (or "being under the influence of" a narcotic) was a contributing cause. We hold that Dr. Snider's uncontroverted testimony that Mr. Smith's level of intoxication impaired his faculties and contributed to his death is sufficient to meet this burden and to entitle Liberty to summary judgment in the absence of any competent and relevant controverting evidence.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.